### THE HERCULES.

### THE IRA M. HEDGES.

(Circuit Court of Appeals, Second Circuit. March 10, 1914.)

### No. 105.

Towage (§ 11*)—Injury to Tow by Floating Ice—Liability of Tug.

Merely to tow in the Hudson river while there is floating ice there, even at night, is not negligence, and the owner of a barge who placed her in a tow in February to go up the river, with as much knowledge of conditions as the towing company had, cannot recover for her injury by ice, without negligence on the part of the tug.

[Ed. Note.—For other cases, see Towage, Cent. Dig. §§ 11–23; Dec. Dig. § 11.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Appeal from the District Court of the United States for the Southern District of New York.

Suit in admiralty by John Cook against the steam tugs Hercules and Ira M. Hedges; the Cornell Steamship Company, claimant. Decree 'for respondents, and libelant appeals. Affirmed.

The following is the statement of the case by Hand, District Judge, with his opinion thereon:

This is a libel in rem for damages caused by an alleged negligent towing on the Hudson river on the 26th of February, 1912. The injured boat was a coal barge which had been delivered to the claimant at its wharf in New York off Fifty-First street some time about ·midday on that day. She was then put on the end of a tow in charge of claimant's two tugs, Hercules and Hedges, in the first two tiers of which there were three boats; the starboard boat being a lighter somewhat larger than the barges which made up the rest of the tow. The libelant's barge was the starboard barge on the last tiers. The tow left Fifty-First street about 2 p. m., took on three boats at Edgewater, and slowly worked its way up to above Spuyten Duyvil about 9 o'clock p. m. At that time it met a field of ice floating down the river which extended well over to the east shore, but left a space on the west shore to within about 200 feet. The tug starboarded from a course about 500 feet off shore and the tow slowly followed on. The ice continuing down the river struck the libelant's barge before it had wholly straightened out under the starboarding of the tug, thus causing the injuries complained of, from which the barge soon after had to be beached and eventually sank. The libelant during the day had gone to the officers of the claimant in New York and asked some one in charge whether there was any ice in the river. There is some dispute as to the answer he got. He says he was assured there was none, and the claimant says that the answer was that there was none to be seen from Pier 51. As matter of fact the river was closed over as far down as Dobb's Ferry or Hastings, but at the time the tow started no ice could be seen as far off as Yonkers, which was the terminus of the proposed voyage. In fact none was encountered, except the floe in question, until the tow arrived early next morning opposite Yonkers, when there was some difficulty in breaking through the ice on the east shore. The winter had been an unusually severe one, and there had been from time to time much ice in the river.

### Opinion.

The only question in this case is whether it was negligent to tow the barge at night during a season of the year when ice was to be expected. As to the danger from ice, I cannot see how that was the tug's fault; the barge need not have joined the tow, and, if it did, it took its own chances. Cook knew as well as the claimant what was the likelihood of ice. He inquired and got answer that there was no ice as far as Yonkers, which was the truth as far as has been shown, and that was all the assurance that he could get. Of course, the claimant could not guarantee that no floe would break loose before the flotilla arrived at Yonkers, and, if he so understood their statement, he is to blame for his mistake. Merely to tow in the Hudson river while there is ice there is not negligent (The Edwin Terry, The William E. Cleary, 162 Fed. 309, 89 C. C. A. 17 [C. C. A. 2d Cir.]), not even though the towing be done·at night (The Edwin Terry, 162 Fed. 311, 89 C. C. A. 19). Indeed, those cases are, if anything, stronger for the libelant than the case at bar, because here the libelant delivered the barge for this particular voyage, while in ·those cases the consent was implied from a standing agreement which covered this period. "People who navigate the Hudson river at 3 o'clock in the morning of a day in February take their chances of meeting ice."

But, the libelant says, this rule has been modified or overruled in Monk v. Cornell Steamboat Co., 198 Fed. 472, 117 C. C. A. 232. At least it was not expressly overruled, although the same judges sat as in the cases of The Ed-

win Terry, supra. Furthermore the tug was absolved as in the case of the Terry. The libelant's reliance is upon Judge Ward's language on page 475 of 198 Fed., on page 235 of 117 C. C. A.: "If a tug tows a boat in her charge through dangerous ice without any consultation with her master or owner, the tug and owners will be solely responsible for damage to the boat. The Rambler (D. C.) 66 Fed. 355. If in such case the tug tow the boat with the consent of her master or owner, the tug and owners will be only liable for half the damages the boat may sustain. The Phœnix (D. C.) 143 Fed. 350. In such case the master or owner of the boat towed agrees to take the risk of towing in the ice; the tug and owners will not be liable for towage in ice, but only for negligence in so towing. The Packer (C. C.) 28 Fed. 156."

The libelant says that in this case like The Phœnix (D. C.) 143 Fed. 350, cited by Judge Ward, damages should be divided. The facts in Monk v. Cornell Steamboat Co., supra, were different from The Edwin Terry, supra, in this important respect: That in The Edwin Terry there was floating ice in the river, while in Monk v. Cornell Steamboat Co. the tug had to break her way through a quarter of a mile of solid ice. So in The Phœnix, supra, the tug had to tow out the barge through a channel 40 feet wide in a completely frozen harbor. The Rambler, supra, while not a case of towing through a channel in solid ice, was one of towing without the owner's knowledge. In The James A. Wright, 3 Ben. 248, Fed. Cas. No. 7,190, the tug attempted to force a passage through solid ice. In The Packer, supra, the tug was breaking through ice when the scow was hurt.

Now it may seem as though the distinction were somewhat trivial between navigating in a river where there is, or might be, floating ice, and moving through a channel in solid ice; yet this is a valid distinction, because otherwise all towing in the Hudson river for four or five months of the year must be condemned as negligent and the tugs held in half damages unless they get an express acceptance of the risk. Such a result seems to me absurd; there doubtless is inherent danger in such towing, but the cost of escaping it is too great, if it involves stopping all winter navigation. A prudent man will undertake some risks when he must stop all gainful use of his property, as the cost of avoiding them. The fraction of negligence has not only the dividend of the probability of danger but the divisor of the pressure of necessity. On the other hand, the difficulties and dangers in breaking through solid ice, or navigating in a narrow channel, are too great to make it in usual circumstances of great value to commerce; people will not do it except under especial stress, and it ought to be done only after some express understanding is reached. So I have no idea that the three judges meant to overrule The Edwin Terry, supra, when they decided Monk v. Cornell Steamboat Co.

There remains the question of the time of starting, which was at 2 o'clock in the afternoon. At that season of the year the sun is up only about 11 hours, and daylight lasts no more than 12. This voyage from New York to Yonkers began at about 2 p. m., and the last boat was not landed till 8 the next morning, about 16 hours in all. Therefore some of the journey had to be undertaken in the dark, if it was to be undertaken at all. Must the tows be made up at daybreak, so as to secure the minimum of daylight for the voyage? Must the boats that make them up be brought there in the night or lie at the wharf all night? Surely these are unreasonable requirements, more than any corresponding security warrants. The custom of towing at night is well known and was a necessary incident of the voyage which Cook accepted when he delivered his barge. He then knew that she could not start until afternoon, and he knew she could not arrive till after dark.

I can see no respect in which the tugs are to blame, and the libel will be dismissed.

This cause comes here upon appeal from a decree of the District Court, Southern District of New York, dismissing a libel filed against steam tugs to recover damages sustained by the tow being brought into collision with floating ice in the Hudson river about a mile above Spuyten Duyvil.

Martin A. Ryan, of New York City, for appellant.
Amos Van Etten, of Kingston, N. Y., for appellee.

Before LACOMBE, COXE, and WARD, Circuit Judges.

PER CURIAM. The decree of the District Court is affirmed, with costs of appeal, on the opinion of Judge Hand.