## THE CLARENCE P. HOWLAND.

## PAUL et al. v. HOWLAND TOWING & TRANSPORTATION CO.

(Circuit Court of Appeals, Second Circuit. December 6, 1926.)

### No. 107.

1. **Towage** ⬤15(2)—**Collision of tow with pier, due to tug's failure to check headway, requires explanation by tug to rebut presumption of negligence.**

Collision of tow with pier, due to failure of tug to check headway as vessels approached pier, requires explanation by tug to rebut presumption of its negligence.

2. **Towage** ⬤15(2)—**Evidence held not to rebut presumption of tug's negligence arising from collision of tow with pier.**

Evidence *held* not to rebut presumption of tug's negligence arising from collision of tow with pier, but showed tug's negligence in approaching too close before attempting to check headway.

Appeal from the District Court of the United States for the Eastern District of New York.

Libel by Charles C. Paul and another against the steam tug Clarence P. Howland, claimed by the Howland Towing & Transportation Company. Libel dismissed, and libelants appeal. Reversed, with directions.

This is an appeal from a decree in admiralty of the District Court for the Eastern District of New York, which dismissed the libel.

MacFarland, Taylor & Costello, of New York City (Willard U. Taylor and Alfred H. Strickland, both of New York City, of counsel), for appellants.

Foley & Martin, of New York City (William J. Martin, of New York City, of counsel), for appellee.

Before MANTON and MACK, Circuit Judges, and AUGUSTUS N. HAND, District Judge.

AUGUSTUS N. HAND, District Judge. Claimant's tug, Clarence P. Howland, had in tow libelants' four-masted schooner Charles Struven. The tug was 85 feet long and the schooner 170 feet long, carrying a cargo of 575,000 feet of lumber. The tug was on the port after quarter of the schooner, and had brought her to a point near the foot of Van Brunt Street, Brooklyn, with the purpose of placing her starboard side to the pier at the Beard Stores. When the schooner was at a distance from the pier variously estimated by the witnesses at from 25 to 175 feet, the master of the tug, who was at the time on the schooner directing operations, gave a signal to his mate to back. Instead of slowing down, the schooner and tug continued their headway until the bowsprit of the schooner crashed through the door of a warehouse on the pier. This collision broke the jibboom and parted its guys.

The cause of the failure of the tug to check the headway of the schooner and to moor her safely is the matter in dispute in this case. The claimant attributed the collision to a stick of driftwood, which was thought to have jammed the propeller. No one pretended to have seen such a stick in the wheel, and Brooks, the engineer of the tug, who saw her in dry dock three or four months after the event, and examined the propeller, found it all right.

The master of the tug said there was "quite a lot of driftwood around at that time," but he testified that he was out on the bow of the schooner and 125 feet from the Howland, when the wheel was said to have failed to work (Record, folio 107), and he admitted that, in answer to the inquiry of the mate of the schooner as to what seemed to be the trouble, he had replied: "I really do not know; something went wrong." Both the captain and mate of the schooner testified that the tugmaster said to them that his signal must have been misunderstood (folios 39 and 66); but they agreed that they heard nothing at the time about the fouling of the propeller. The engineer, Brooks, did say that after a few revolutions in reverse the tug "fetched upon something," which he could feel in the engine room; that, when he found he could not back, he "worked her backward and forward, trying to get her to go back, and finally * * * got her backing." He testified that the water about the stern was full of driftwood, and his explanation of the alleged jamming of the propeller was that the engine "could not stop any other way" (folio 136). He was asked, however (folio 151):

"Q. Now, you stated you thought that the propeller got jammed. You do not know whether it got jammed? A. Well, I pretty near know."

Martin, the mate on the Howland, testified that he gave the order for backing, and "she stopped, and the engineer started her ahead, and started to go back again; she stopped. She fetched up then. * * * Q. That is all you know about it? A. That is all." (Folio 186.) He said nothing about seeing driftwood.

The witness Charles P. Smith, a man who meets vessels that come into the Erie Basin and makes fast the lines to the pier, testified

that he was on the bulkhead of the Van Brunt street pier at the time of the collision and saw it. He swore that he "ran down to the end of the schooner, looked over, and (saw) something like drift, like an old piece of wood, come from the stern of the towboat, like something come from the wheel, and the next thing * * * (saw) the bowsprit heading for the two doors and taking off a little red brick" (folio 165). He added that the pier "was a great place for driftwood" (folio 175); "that the captain sat down the other day and explained. I asked him quite a little."

On further cross-examination, he said that he had first talked to the captain about the driftwood four or five months before, and farther along stated that the captain had told him six months before that the case was coming up, and asked him if he remembered it. Smith said: " 'Yes, give me a little idea, and I might explain it.' Three days he came to me with the same statement, and I said, 'Yes, that is about the same.' "

Such testimony as that of the witness Smith is patently unreliable, and he is the only witness, except the master, mate, and engineer of the tug, whose testimony tended in any way to substantiate the theory of a jammed propeller. The last three persons were manifestly interested witnesses. The master of the tug could not possibly have seen her propeller when the supposed jamming occurred, for he was far away at the bow of the schooner, and neither he, nor the mate, nor the engineer, claims to have seen any stick of driftwood in the propeller blades, nor to have discovered any injury to them caused by working the propeller backward and forward to throw out the hypothetical obstruction.

The mate, Martin, said that he judged that the schooner was only 25 feet from the dock when the first order to reverse was given. (Folio 195.) Brooks, the engineer, said that, when he found his propeller jammed, he was very close to the tug, not over 50 feet away, but that he was really too excited to say. (Folio 148.) Taylor, the mate of the schooner, estimated the distance of the schooner from the dock at the time the order was given at 100 feet, and the master of the tug at 175 feet. Her rate of speed was estimated by Taylor at 3 or 4 miles an hour, but by her master at 1½ miles an hour. Even if we average the various estimates of distance, no check was given to her headway of at least 1½ miles an hour until she was less than 100 feet from the pier.

[1] Such a collision as occurred unquestionably calls for an explanation. It was held in Kiernan v. Lake Champlain Transportation Co. (C. C. A.) 273 F. 499, following The W. G. Mason, 142 F. 913, 74 C. C. A. 83, that where a misfortune occurs without any fault on the part of the tow, under circumstances in which, if proper care is exercised in performing a similar service, such misfortune does not ordinarily occur there is a presumption of negligence. In other words, the situation calls for an explanation, and there is a duty on the part of the tug to offer evidence to meet the presumption. There was no testimony adduced of a single witness who saw a stick of driftwood in the propeller, or who found the propeller injured, as it would have been likely to be, if a stick had been caught in it.

[2] The claimant has merely shown by some interested witnesses, one of whom, Smith, was evidently untrustworthy, that there was driftwood around the place, and that the propeller suddenly fetched up, and, after being worked backward and forward a few times, resumed normal operation. There is no direct evidence of the presence of a stick of driftwood in the propeller, and we do not regard the testimony of the interested witnesses as of sufficient weight to justify what is at best only claimant's theory of the cause of the collision. The only witness for the claimant who could personally have known anything about the jamming of the propeller was the engineer, who, in answer to the question, "You do not know whether it got jammed?" had no more to say than, "Well, I pretty near know."

But, irrespective of the failure of the claimant to offer any credible explanation of the collision consistent with the exercise of due care on the part of the tug, we are of the opinion that there is affirmative evidence that, even if a stick of driftwood did cause the propeller to jam for a very short time, the proximate cause of the accident was due to a failure sooner to begin to check the headway of the schooner.

If the place was as full of driftwood as the master of the Howland said, he should have proceeded with particular caution, with that fact in view. He testified that he had had experience in cases where tugs picked up débris in the East and North Rivers:

"Q. When you picked it up, have you stopped? A. Yes; if we cannot get it out.

"Q. Are there times you do not have to stop? A. Yes; it is an ordinary thing. It might happen ten times a day."

Now, if this testimony is to be credited, the master of the Howland, who was direct-

ing the operations, was aware of the danger, and brought the schooner within a short distance of the pier at a speed too great to control her when docking, if any interference with his propeller by driftwood should occur. We are of the opinion that the tug should have begun to check the headway of the schooner more than she did before coming in close proximity to the dock.

From the above it appears that the claimant has not met the presumption of fault arising out of the collision, which would not ordinarily have happened, if proper care had been exercised:

(1) Because no satisfactory proof was offered to explain the accident.

(2) Because, even if the theory of a jammed propeller be adopted, the tug was still negligent in bringing the schooner too near the dock before giving the order to reverse.

The decree is reversed, with costs of this appeal, and with a direction to enter an interlocutory decree in favor of the libelants in accordance with this opinion.